# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 71837-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| DELANTE IAN HOWERTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: March 30, 2015 |
| | ) | |

LAU, J. — Delante Howerton appeals his conviction for second degree attempted taking of a motor vehicle without permission and making or having vehicle theft tools. Howerton argues the trial court erred when it failed to suppress evidence following an unconstitutional seizure. He contends police acted on an unreliable 911 citizen informant tip and therefore seized him without the reasonable suspicion required by Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). He also argues the trial court erred by failing to timely file written findings of fact and conclusions of law. Because the citizen informant's tip demonstrated sufficient indicia of reliability supporting a reasonable suspicion and because Howerton fails to demonstrate that the trial court's findings and conclusions prejudiced him, we affirm the judgment and sentence.

FACTS

On September 29, 2013, at 2:00 a.m., Laura Parks called 911 from her cell phone to report that she just witnessed someone break into a van parked across the street from her house. She provided her name, address, and telephone number to the dispatcher. Parks described the suspect as a black male, average build, five feet seven inches tall, wearing a baggy black leather jacket and baggy pants. She stated he left the area on foot and was heading south on Second Avenue in Burien, Washington.

King County Deputy Sheriff David Hutchinson was dispatched to the area at 2:03 a.m. and arrived at 2:06 a.m—six minutes after Parks dialed 911. He received the description of the suspect from the 911 dispatcher—black male with short hair, wearing a black leather jacket and baggy pants. He also knew the suspect was heading south on Second Avenue. As Hutchinson drove north on Second Avenue, he saw Delante Howerton walking south. Howerton matched the description of the suspect from the 911 call. When Howerton saw Hutchinson's patrol car, he turned around and walked the other direction. Howerton complied when Hutchinson told him to stop and come over to his car. He placed Howerton in handcuffs and noticed a blade sticking out of Howerton's sleeve. When Hutchinson searched Howerton for weapons, he found a foot-long bread knife and a screwdriver.

Deputy Kelley Kinser arrived, spoke to Hutchinson, and spoke with Parks on the telephone. Parks watched Hutchinson detain Howerton from her house. She confirmed

that Howerton was the individual she saw break into the van earlier. Hutchinson

arrested Howerton and read him his Miranda rights.[1]

The vehicle Parks saw Howerton break into was damaged. The front passenger

window was smashed out and the ignition and steering column sustained significant

damage. Gretchen Lemon, the owner of the van, confirmed that it was not damaged

when she parked it the night before. Lemon did not know Howerton and did not give

him permission to enter her van.

Howerton was charged by information with attempted theft of a motor vehicle,

making or having vehicle theft tools, and intimidating a public servant. The trial court

later dismissed the charge of intimidating a public servant. Howerton moved to

suppress evidence obtained as a result of the investigatory detention. Specifically,

Howerton argued Hutchinson lacked reasonable articulable suspicion to detain him

when Hutchinson's only source of information was from a named but unknown

telephone informant. After a CrR 3.5 and 3.6 hearing, the trial court denied Howerton's

motion to suppress.

A jury convicted Howerton of misdemeanor second degree attempted taking of a

motor vehicle without permission and making or having vehicle theft tools. The court

imposed suspended consecutive sentences of 364 days on each count on the condition

that Howerton serve 150 days of confinement. Howerton appeals.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

## ANALYSIS

### Standard of Review

The court reviews a trial court's order following a motion to suppress evidence to determine if substantial evidence supports the trial court's factual findings. State v. Hill, 123 Wn.2d 641, 647, 870 P.2d 313 (1994). We review the trial court's legal conclusions de novo. State v. Carneh, 153 Wn.2d 274, 281, 103 P.3d 743 (2004).

Whether policed have seized a person is a mixed question of law and fact. State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). What the police said and did and what the defendant said and did are questions of fact. State v. Bailey, 154 Wn. App. 295, 299, 224 P.3d 852 (2010). What legal consequences flow from those facts is a question of law. State v. Lee, 147 Wn. App. 912, 916, 199 P.3d 445 (2008). Whether a warrantless seizure or Terry stop passes constitutional muster is a question of law the court reviews de novo. State v. Rankin, 151 Wn.2d 689, 694, 92 P.3d 202 (2004).

### Whether the 911 Call Supported Reasonable Suspicion

"[A] stop, although less intrusive than an arrest, is nevertheless a seizure and therefore must be reasonable under the Fourth Amendment and article 1, section 7 of the Washington Constitution." State v. Kennedy, 107 Wn.2d 1, 4, 726 P.2d 445 (1986). An investigatory Terry stop is permissible if the investigating officer has "a reasonable and articulable suspicion that the individual is involved in criminal activity." State v. Walker, 66 Wn. App. 622, 626, 834 P.2d 41 (1992). A reasonable suspicion is the "substantial possibility that criminal conduct has occurred or is about to occur." Kennedy, 107 Wn.2d at 6.

It is well established that, "[i]n allowing such detentions, Terry accepts the risk that officers may stop innocent people." [Illinois v.] Wardlow, 528 U.S. [119,] 126[, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)]. However, despite this risk, "[t]he courts have repeatedly encouraged law enforcement officers to investigate suspicious situations. State v. Mercer, 45 Wn. App. 769, 775, 727 P.2d 676 (1986)."

Lee, 147 Wn. App. at 918. A reasonable suspicion can arise from information that is less reliable than that required to establish probable cause. Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990). We review the reasonableness of the police action in light of the particular circumstances of each case. State v. Lesnick, 84 Wn.2d 940, 944, 530 P.2d 243 (1975).

An informant's tip can provide police with reasonable suspicion to justify an investigatory Terry stop if the tip possesses sufficient "'indicia of reliability.'" State v. Sieler, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980) (quoting Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)). Courts employ the totality of the circumstances test to determine whether an informant's tip possessed sufficient indicia of reliability to support reasonable suspicion. State v. Marcum, 149 Wn. App. 894, 903, 205 P.3d 969 (2009); see Illinois v. Gates, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). When deciding whether this indicia of reliability exists, the courts will generally consider several factors, primarily "(1) whether the informant is reliable, (2) whether the information was obtained in a reliable fashion, and (3) whether the officers can corroborate any details of the informant's tip." Lee, 147 Wn. App. at 918. "The existing standard does not require all three factors to establish indicia of reliability." State v. Saggers, 182 Wn. App. 832, 840 n.18, 332 P.3d 1034 (2014).

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—

-5-

quantity and quality—are considered in the 'totality of the circumstances—the whole picture,' United States v. Cortez, 449 U.S. 411, 417[, 66 L. Ed. 2d 621, 101 S. Ct. 690] (1981), that must be taken into account when evaluating whether there is reasonable suspicion."

Lee, 147 Wn. App. at 917 (alteration in original) (quoting State v. Randall, 73 Wn. App. 225, 229, 868 P.2d 207 (1994)).

1. Reliability of the Informant

Known citizen informants are presumptively reliable. "Citizen informants are deemed presumptively reliable." State v. Gaddy, 152 Wn.2d 64, 73, 93 P.3d 872 (2004); see also Kennedy, 107 Wn.2d at 8 ("The neighbors' information does not require a showing of the same degree of reliability as the informant's tip since it comes from 'citizen' rather than 'professional' informants."); State v. Conner, 58 Wn. App. 90, 96, 791 P.2d 261 (1990) ("We hold that . . . a citizen informant reporting a crime can be inherently reliable for purposes of a Terry stop, even if calling on the telephone rather than speaking to the police in person."). In Lee, we discussed the enhanced reliability of an eyewitness informant:

> A citizen-witness's credibility is enhanced when he or she purports to be an eyewitness to the events described. State v. Vandover, 63 Wn. App. 754, 759, 822 P.2d 784 (1992); United States v. Colon, 111 F. Supp. 2d 439, 443 (S.D.N.Y. 2000) ("crystal clear that the caller had first hand knowledge of the alleged criminal activity"), rev'd on other grounds, 250 F.3d 130 (2d Cir. 2001). Indeed, "victim-witness cases usually require a very prompt police response in an effort to find the perpetrator, so that a leisurely investigation of the report is seldom feasible." 2 [WAYNE R.] LaFAVE, [SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.4(a),] at 210 [(3d ed. 1996)]. Moreover, courts should not treat information from ordinary citizens who have been the victim of or witness to criminal conduct the same as information from compensated informants from the criminal subculture. 2 LaFAVE, supra, at 204.
> [A]n ordinary citizen who reports a crime has been committed in his presence . . . stands on much different ground than a police informer. He is a witness to criminal activity who acts with an intent to aid the police in law enforcement because of his concern for society or for his own safety.

> 2 LaFave, *supra*, at 208. Thus, the police are entitled to give greater credence to a report from a citizen crime victim than to a report from a criminal associate of the suspect. 2 LaFave, *supra*, at 205. Indeed, there is no constitutional requirement that police distrust ordinary citizens who present themselves as crime victims and "[c]ourts are not required to sever the relationships that citizens and local police forces have forged to protect their communities from crime." United States v. Christmas, 222 F.3d 141, 145 (4th Cir. 2000).

Lee, 147 Wn. App. at 918–19 (last alteration in original).

> When a citizen informant provides information, a relaxed showing of reliability suffices "because there is less risk of the information being a rumor or irresponsible conjecture which may accompany anonymous informants" and "an identified informant's report is less likely to be marred by self-interest."
> Accordingly, "[c]itizen informants are deemed presumptively reliable."

State v. Ollivier, 178 Wn.2d 813, 850, 312 P.3d 1 (2013) (alteration in original) (quoting

Gaddy, 152 Wn.2d at 64, 73).

But even if Parks receives no presumption of reliability, we nevertheless

conclude that her tip possessed adequate indicia of reliability to justify an investigative

detention.

First, Parks's 911 call demonstrated a sufficient factual basis to provide

reasonable suspicion for the seizure. Though not a required element, the factual basis

of an informant's tip may be relevant to its reliability: "[A]n officer's information

regarding the factual basis for the informant's conclusion that criminal activity has

occurred is relevant to the totality of the circumstances analysis." State v. Z.U.E., 178

Wn. App. 769, 785, 315 P.3d 1158 (2014); see also, Marcum, 149 Wn. App. at 904

("Unlike the analysis in an Aguilar/Spinelli[2] inquiry, the so-called 'veracity' and 'basis of

knowledge' 'prongs' are not distinct under the totality of the circumstances test; rather,

---

[2] Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)

these elements are relevant but are 'no longer both essential.'" (quoting State v. Jackson, 102 Wn.2d 432, 435–36, 688 P.2d 136 (1984)). An informant's credibility is enhanced when he or she is an eyewitness. Lee, 147 Wn. App. at 918; see also Navarette v. California, __ U.S. __, 134 S. Ct. 1683, 1689, 188 L. Ed. 2d 680 (2014) (noting that eyewitness knowledge of the alleged criminal activity "lends significant support to the tip's reliability.").

Here, Parks unequivocally indicated to the 911 dispatcher that she was an eyewitness. When she called 911, she told the dispatcher, "I just saw a robbery." She provided her full name, her address, and her telephone number. She indicated that she was willing to speak with police if they needed to contact her. She told the dispatcher the incident occurred "directly across the street" from her house and that it "just now happened." She stated that an individual "broke into a car." She said she actually saw him enter the car. She gave a detailed description of the suspect—black male, average build, short hair, five feet seven inches tall, wearing a baggy black leather jacket and baggy pants. The dispatcher immediately broadcast this description via radio to officers. Parks stated that the suspect just left the scene heading south on Second Avenue. She also accurately described the street location. She stated that there were four parked cars in the area and the one broken into was a blue, late '90s model Dodge Caravan.

Further, Parks reported objective facts that indicated criminal rather than legal activity. Kennedy, 107 Wn.2d at 7. An informant's "bare conclusion unsupported by any factual foundation" is insufficient to support an investigatory stop. Sieler, 95 Wn.2d at 49. In both Z.U.E. and Hopkins, the court found informants unreliable when they

failed to allege objective facts indicating a crime had occurred. Z.U.E., 178 Wn. App. at 786; State v. Hopkins, 128 Wn. App. 855, 864, 117 P.3d 377 (2005). Here, Parks told the dispatcher that she "saw a robbery." She later clarified that someone "broke into a car." Parks also confirmed that the suspect had entered the car:

> Dispatch: Okay. But he actually did enter the car?
> Caller: Yeah.

Parks reinforced her factual basis for these allegations by stating that the incident "just now happened" and that the car was directly across the street from her house. Parks reported facts she personally observed.

Howerton argues that even if Parks provided a sound factual basis for her claims, Hutchinson was unaware of this factual basis. We disagree. Specifically, Howerton claims that Hutchinson was unaware that Parks was an eyewitness. Indeed, police may not assume that an informant was an eyewitness. See State v. Vandover, 63 Wn. App. 754, 759–60, 822 P.2d 784 (1992). But here, the record shows that the 911 dispatcher communicated all the relevant facts to Hutchinson, including that the citizen informant personally saw criminal activity. A summary of the radio communication[3] between Hutchinson and the dispatcher demonstrates the dispatcher told Hutchinson that the citizen informant saw Howerton enter a parked car:

> [Dispatch:] VEH PROWL JUST, SUSP COA ON FOOT SB 2ND
> . . . .
> Race: B Sex: M Hght: 507 Wght: THIN Misc: BLK BAGGY LEATHER JACKET BAGGY PANTS SHORT HAIR
> . . . .

---

[3] A computer-aided dispatch (CAD) printout records all of the communication traffic involving 911 dispatch, the reporting party, and the officers.

> RP [Reporting Party] SAW HIM ENTER A VAN , UNK[OWN] IF HE STOLE ANYTHING . . . . VAN IS PARKED W/4 OUTHER [sic] VEHS ACROSS STREET FROM LOC
>
> . . .
>
> VehCol: BLU Year: 1995 Make: DODG Model: MINIVAN

(Emphasis added.) At the suppression hearing, Hutchinson confirmed that the report indicated the citizen informant was an eyewitness and that he received the report before seizing Howerton:

> [The State:] Sir, on the CAD [computer-aided dispatch report] around minute 2:04:09, the information there about the suspect being unknown of what was taken by suspect in a van, was that information that was provided to you as well in advance of your seeing Mr. Howerton?
>
> [Hutchinson:] It looks like that information was provided at 0204, and I came into the area at 0206, so approximately two minutes beforehand is when that information would have been provided.
>
> Q. And so this indicates that a reporting party saw him, the suspect, in her van—
>
> A. Right.
>
> Q. -- unknown if he stole anything, parked across the street from the location. So that information, is that indicative of what would have been related to you over the radio?
>
> [Hutchinson:] I believe so, yes.

1 Report of Proceedings (Mar. 10, 2014) at 27–28. The CAD report and Hutchinson's testimony show that he knew the citizen informant was an eyewitness and had reported objective facts indicating criminal activity. The facts known to Hutchinson, discussed above, support a reasonable suspicion sufficient to detain Howerton.

Parks's contemporaneous report of the criminal activity also weighs in favor of her reliability. In Navarette, commenting, "[T]his is a 'close case,'" 134 S. Ct. at 1692, the Supreme Court found an informant's tip reliable when the informant reported a drunk driver almost immediately after being run off the road by that driver:

-10-

> That sort of contemporaneous report has long been treated as especially reliable. In evidence law, we generally credit the proposition that statements about an event and made soon after perceiving that event are especially trustworthy because "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Advisory Committee's Notes on Fed. Rule Evid. 803(1) . . . . Unsurprisingly, 911 calls that would otherwise be inadmissible hearsay have often been admitted on those grounds.

Navarette, 134 S. Ct. at 1689. The Court noted that police confirmed the drunk driver's location based on the informant's tip. It was located a few miles away roughly 18 minutes after the 911 call. Navarette, 134 S. Ct. at 1689. Similarly, Parks reported the crime immediately after she witnessed it. She told the 911 dispatcher that it "just now happened." Six minutes later, Hutchinson found Howerton walking south on Second Avenue Southwest just as Parks had described. When Hutchinson detained Howerton, it was within 50 yards of the car he had broken into. Parks was able to view Hutchinson's entire interaction with Howerton from her house.

Howerton argues Parks's tip lacked sufficient indicia of reliability, relying mainly on Hopkins and Z.U.E.[4] We are not persuaded by Howerton's reliance on these cases. Neither case controls due to the significant factual differences present here. For instance, in Z.U.E., the court found one informant's tip unreliable when the record failed to clearly establish the basis for the informant's knowledge. Z.U.E., 178 Wn. App. at 785. The court found the second informant's tip unreliable because the informant failed to allege objective facts indicating criminal activity. Z.U.E., 178 Wn. App. at 786. The second informant alleged facts suggesting the suspect was a minor in possession of a firearm, but the informant failed to explain how she knew the suspect was a minor, and

_____

[4] We note that Z.U.E. is currently under review at the Washington Supreme Court. State v. Z.U.E., No. 89894-4.

simply "carrying a gun is not automatically a crime." Z.U.E., 178 Wn. App. at 786.

Similarly, in Hopkins the informant alleged only that the suspect was carrying a gun,

which is "insufficient to justify an investigatory stop." Hopkins, 128 Wn. App. at 864 n.6.

The record here clearly establishes Parks's basis of knowledge. Unlike the first

informant in Z.U.E., Parks unequivocally stated she was an eyewitness and 911

dispatch communicated that fact to Hutchinson before he seized Howerton. Further,

unlike the second informant in Z.U.E. and the informant in Hopkins, Parks alleged

objective facts indicating criminal activity. The dispatcher told Hutchinson that the

reporting person actually saw the suspect enter a parked car. These facts present a far

more compelling case for reliability than either Z.U.E. or Hopkins. It is well settled that

the reasonableness of police action when making an investigatory stop must be

reviewed on a case by case basis. Lesnick, 84 Wn.2d at 944 ("Terry . . . emphasize[s]

that no single rule can be fashioned to meet every conceivable confrontation between

the police and citizen. Evaluating the reasonableness of the police action and the

extent of the intrusion, each case must be considered in light of the particular

circumstances facing the law enforcement officer."). We conclude Parks was a reliable

citizen informant under the circumstances here.

2. Whether the Information was Obtained by Reliable Means

Under the totality of the circumstances test, courts also consider whether the

information was obtained in a reliable fashion. Lee, 147 Wn. App. at 918. In Navarette,

the Court stated that use of the 911 system enhances the reliability of an informant's tip.

Navarette, 134 S. Ct. at 1689–90. Specifically, "[a] 911 call has some features that

allow for identifying and tracing callers, and thus provide some safeguards against

making false reports with immunity. . . . Given the foregoing technological and regulatory developments . . . a reasonable officer could conclude that a false tipster would think twice before using such a system." Navarette, 134 S. Ct. at 1689–90; see also Saggers, 182 Wn. App. at 847 ("[The Supreme Court's] discussion of reliability [in Navarette] includes the observation that the Federal Communications Commission [FCC] requires cellular phone carriers to report a caller's phone number and geographic location to 911 dispatch, making the caller more readily identifiable." (citing Navarette, 134 S. Ct. at 1690)). In Saggers, the informant "was completely unknown to the police, called from a pay phone that was not traceable to him personally, and he disappeared after making the call." Saggers, 182 Wn. App. at 845–46. Under these facts, the technological safeguards of the 911 system described in Navarette made no difference as to the 911 call's reliability.

But unlike Saggers, Parks called 911 from her house using her personal cell phone.[5] She provided her full name, telephone number, and address. She indicated she was willing to speak with police should they decide to contact her. In Saggers, we noted the "officers had good reason to question the reliability of the 911 call . . . ." Saggers, 182 Wn. App. at 847. Here, Hutchinson had no reason to doubt Parks' reliability.

---

[5] The caller used "the 911 emergency system, which records calls and can be used to later identify tipsters." Saggers, 182 Wn. App. at 843–44. And the FCC requirement that cellular carriers report the caller's telephone number and location to all 911 dispatch facilitates identity of the caller. Navarette, 134 S. Ct. at 1690.

Corroboration

While not a required factor, as noted above, courts also consider whether police corroborated information from the informant's tip. Lee, 147 Wn. App. at 918. Howerton contends that Hutchinson failed to "corroborate the tip by observing suspicious behavior . . . and '[c]onfirming a subject's description or location or other innocuous facts does not satisfy the corroboration requirement.'" Br. of Appellant at 13 (quoting Z.U.E. 178 Wn. App. at 787). We disagree. The complete facts known to Hutchinson before he detained Howerton corroborate the citizen informant's 911 call.

In Marcum, the court rejected an approach that views observations by police officers "one by one," in isolation divorced from the totality of the circumstances test:

> The trial court's conclusion that the police observations confirming the informant's tip were "innocuous" was likewise unfounded. Indeed, the United States Supreme Court has specifically criticized viewing incriminating police observations, one by one, in a manner divorced from their context as a "divide-and-conquer" approach that is inconsistent with the totality of the circumstances test. See United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Here, as in Arvizu, the lower court's "evaluation and rejection" of the officers' observations "in isolation from each other" did "not take into account the 'totality of the circumstances.'" 534 U.S., at 274. Here, as in Arvizu, the lower court appeared to believe that each of the officers' observations "was by itself readily entitled to 'no weight.'" 534 U.S. at 274 (quoting United States v. Arvizu, 232 F.3d 1241, 1249-51 (9th Cir. 2000)). Here, as in Arvizu, this approach "departs sharply from the teachings" of the cases that properly examine the totality of the circumstances to determine whether reasonable suspicion exists. 534 U.S. at 274, 122 S. Ct. 744. Contrary to the trial court's implication in its order, "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." Arvizu, 534 U.S. at 277; see also Kennedy, 107 Wn. 2d at 6 (explaining that activity consistent with both criminal and noncriminal activity may justify a brief detention). Rather, "the determination of reasonable suspicion must be based on commonsense judgment and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000). "In allowing [investigative] detentions, Terry accepts the risk that officers may stop innocent people." Wardlow, 528 U.S. at 126.

-14-

Marcum, 149 Wn. App. at 907–08 (alteration in original) (footnote omitted).

Hutchinson's observations confirming the citizen informant's 911 tip are not disputed. At around 2:03 a.m., he was dispatched to the location of a suspected vehicle prowl. He knew that the citizen informant called 911 within minutes of observing the suspect enter a van that was parked with four other vehicles across the street from the citizen informant's location. He knew the citizen informant did not know if any items were stolen from the van. The dispatcher provided Hutchinson with a detailed description of the suspect and the specific street location and direction he was walking. Three minutes after receiving this information, Hutchinson drove in his patrol vehicle to Second Avenue Southwest and observed Howerton walking south in the direction reported by the citizen informant. When Howerton noticed the police vehicle's presence, he immediately turned around and walked away. Hutchinson detained Howerton because he matched the detailed description of the vehicle prowl suspect provided by the citizen informant to 911. Although a suspect's flight from police alone is not enough to justify an investigative stop, it is a factor that may be considered in determining whether reasonable suspicion existed.[6] State v. Gatewood, 163 Wn. 2d 534, 540, 182 P.3d 426 (2008). Facts that appear innocuous to an average person may appear suspicious to a police officer in light of past experience. See State v. Moreno, 173 Wn. App. 479, 493, 294 P.3d 812 (2013).

---

[6] We are also not persuaded by Howerton's claim that an attempted car theft does not present a danger warranting an investigative stop. Given our discussion above, this claim warrants no discussion.

-15-

The Trial Court's Findings of Fact and Conclusions of Law

Howerton argues in his opening brief that the trial court failed to enter written findings of fact and conclusions of law as required by CrR 3.6. The trial court filed its written findings and conclusions after Howerton submitted his opening appellate brief.

Findings of fact and conclusions of law may be submitted and entered while an appeal is pending if the delay does not prejudice the defendant and there is no indication that the findings and conclusions were tailored to meet the issues presented on appeal. State v. Quincy, 122 Wn. App. 395, 398, 95 P.3d 353 (2004). Here, Howerton waived the issue. In his opening brief, Howerton specifically reserved the right to assign error to the trial court's findings and address the issue of prejudice in his reply brief or a supplemental brief should the trial court file its findings and conclusions. But after the trial court filed its written findings and conclusions, Howerton assigned no error to those findings and did not address the issue of prejudice in his reply brief. Nor did he submit any supplemental briefing addressing the issue.

In any event, Howerton demonstrated no prejudice. The language of the findings and conclusions is consistent with the trial court's oral ruling. The attorney who drafted the findings and conclusions was unaware of the appellate issues. Further, the trial court formally incorporated its oral ruling into the written findings. The trial court's findings and conclusions are properly before this court. Because Howerton assigned no error to any of the findings after they were filed, they are verities on appeal. State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

## CONCLUSION

Under the totality of the circumstances, the indicia of reliability in this case demonstrated sufficient reasonable suspicion to support Howerton's detention by Deputy Hutchinson. The citizen informant's 911 tip demonstrated sufficient indicia of reliability, and the officer's observations corroborated suspicious activity. Howerton established no prejudice based on the tardy CrR 3.6 findings and conclusions. We conclude the trial court properly denied Howerton's CrR 3.6 motion to suppress evidence. We affirm the judgment and sentence.

WE CONCUR: